IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CT-3206-D

| | |
|---|---|
| KEVIN LOU ENGLISH, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> TRACY JOHNS, et al., ) <br> ) <br> Defendants. ) | **ORDER** |

On October 14, 2011, Kevin Lou English ("English") filed this action pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) [D.E. 1]. On May 22, 2012, the court reviewed English's complaint, dismissed defendant Tracy Johns, and directed English to particularize his complaint to "identify specific events and correlating dates which are the bases for the suit, the constitutional rights violated, the injuries sustained, and which defendant allegedly inflicted each injury." [D.E. 6] 3–4. English failed to amend his complaint by the specified deadline, and on July 12, 2012, the court dismissed the action without prejudice [D.E. 7]. On July 16, 2012, English moved to reopen the case and sought an extension of time to file his amended complaint [D.E. 9], which the court granted [D.E. 10]. On August 16, 2012, English filed an amended complaint [D.E. 11]. On September 26, 2012, the court granted in part English's motion to amend and allowed English to proceed with claims concerning disciplinary actions against him, inspection of his outgoing mail, and monitoring of his telephone calls [D.E. 12].

On April 19, 2013, the court ruled on several motions and directed the parties to file proposed scheduling orders [D.E. 26]. The court specifically noted its expectation that the parties comply with the deadlines in any scheduling order in order to move this long-pending case to resolution. Id. 4.

On May 10, 2013, the parties jointly filed a proposed scheduling order [D.E. 28]. On May 23, 2013, Magistrate Judge William A. Webb entered a scheduling order, which set a discovery deadline of June 30, 2013, and a motions deadline of August 15, 2013 [D.E. 29]. On May 28, 2013, English filed a request for production of documents [D.E. 30]. On July 17, 2013, English filed a "motion to overrule objections to request to produce" [D.E. 32], which the court construes as a motion to compel. On July 29, 2013, defendants responded in opposition to the motion to compel [D.E. 33]. On August 7, 2013, English filed a reply [D.E. 34].[1]

On August 15, 2013, defendants filed a motion to dismiss or for summary judgment [D.E. 35], along with a supporting memorandum [D.E. 36] and the declarations of Warden Justin Andrews [D.E. 37] and Commitment and Treatment Program ("CTP") Administrator Karen L. Steinour [D.E. 38]. Because defendants attached materials that are outside the scope of the pleadings, the court construes the motion as one requesting summary judgment. See Fed. R. Civ. P. 12(d). Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified English about the motion, the consequences of failing to respond, and the response deadline [D.E. 39]. On September 9, 2013, English responded in opposition to the motion for summary judgment [D.E. 41]. As explained below, the court denies English's motion to compel and grants defendants' motion for summary judgment.

I.

First, the court addresses English's motion to compel. English's remaining claims concern disciplinary actions against him, inspection of his outgoing mail, and monitoring of his telephone calls. See, e.g., [D.E. 12] 1–3 (describing claims). English seeks discovery of the following:

---

[1] Replies are not permitted in discovery disputes. See Local Civil Rule 26.1(d)(3).

1. Any and all "memoranda," "Institutional Supplements," and "Program Statements" concerning the [CTP] facility in Butner, North Carolina, and its daily operations on how to govern the individuals within the [CTP] facility from between July 26, 2008, and the present.

2. A detailed itemized budget on the operating costs of the [CTP] facility from between July 26, 2008, and the present, detailing the approximate cost spent for each patient in the [CTP] facility, along with the funding authorized by Congress specifically for the [CTP]. This budget should show how the funds are being used and detail how it is assured that there is no intermingling of funds with those used for the criminal population at the Federal Correctional Institution[.]

3. All "lock-up orders" for any and all detainees/commitments in the [CTP] from between July 26, 2008, and the present.

4. All memoranda and written orders/directives directing Federal Bureau of Prisons [(hereinafter "BOP")] staff to conduct mass shakedowns of the [CTP] housing units . . . from between July 26, 2008, and the present.

5. Copies of all "confiscation notices" and "confiscation orders" concerning all items discovered and confiscated during any "mass shakedowns" or "routine/random shakedowns" within the housing areas of the [CTP] facility, from between July 26, 2008, and the present.

6. Documentation of all staff members that conducted searches of Mr. English's rooms while he was housed in the [CTP] facility from between July 26, 2008, and the present, along with any documentation of the results of the searches.

7. Copies of all letters, memoranda, or orders, directing any confiscated items or materials be forwarded to the Office of the United States Attorney for review and possible use in an 18 [U.S.C. §] 4248 civil commitment proceeding dated from between July 26, 2008, and the present.

8. Copies of all "Incident Reports," "Discipline Hearing Officer Reports," and any other reports detailing any sanctions or penalties placed upon Mr. English from between July 26, 2008, and the present.

9. Copies of all letters, memoranda, directives and orders concerning the handling of all incoming and outgoing mail for/from the civilly detained/ committed in the [CTP] facility, from between July 26, 2008, and the present.

10. Copies of all letters, memoranda, directives and orders concerning the monitoring, recording, and restrictions (e.g.[,] blocking of specific telephone numbers and prevention of telephoning toll free "800," "877," etc., numbers)

of telephone calls, along with explanation why *incoming* telephone calls are not made available to those civilly detained/committed in the [CTP] facility, from between July 26, 2008, and the present.

11. All copies of – and any documentation of – any training or special training given to [BOP] employees for dealing with those civilly detained and/or civilly committed in the [CTP] facility, specifically understanding that they are not to be treated punitively.

12. Copies of any records that indicate or show that "correctional officers" and "correctional counselors" assigned to the housing units of the [CTP] facility . . . from between July 26, 2008, and the present have been specially trained in dealing with mental health patients instead of prisoners.

13. All material, memoranda, directives, and/or orders concerning the establishment of the "Recovery Team" assigned to the [CTP] facility, along with the duties of the staff assigned to the Recovery Team.

14. Any and all materials, letters, memoranda, directives, and /or orders from the Directors of the [BOP] to any warden assigned to the Federal Correctional Complex in Butner, North Carolina, establishing the [CTP] facility at the Federal Correctional Institution[.]

15. Any and all materials, letters, memoranda, directives, and /or orders from the United States Attorney General which declare the suitability of the [CTP] facility and proof of the Attorney General's consultation with the Secretary of the Department of Health and Human Services regarding the establishment of standards for the [CTP] facility. In addition, documentation should be provided which shows the Attorney General made reasonable efforts to cause the State of Wyoming to assume responsibility for the custody, care and treatment of Mr. English following Mr. English's commitment. Proof of the Attorney General's visit to the facility should also be provided.

16. Any and all materials, letters, memoranda, directives, and /or orders from the Secretary of the Department of Health and Human Services detailing the standards for the [CTP] facility, along with the general implementation of the Adam Walsh Child Protection and Safety Act of 2006's provisions.

[D.E. 30] 1–4 (emphases in original).

English states that defendants provided partial responses to "requests numbers 1, 5, 7, 8, 9, and 10," and otherwise "improperly objected to ALL of Mr. English's requests," particularly as to English's requests "that pertain to inmates or CTP participants beyond plaintiff." Mot. Compel

4

[D.E. 32] 1–2. Defendants respond that the motion to compel is untimely in that English filed it after the discovery period closed. See, e.g., Sager v. Standard Ins. Co., No. 5:08-CV-628-D, 2010 WL 2772433, at *1 (E.D.N.C. July 10, 2010) (unpublished); PCS Phosphate Co. v. Norfolk S. Corp., 238 F.R.D. 555, 558 (E.D.N.C. 2006). Alternatively, they contend that they have "produced 114 pages, including disciplinary materials involving Plaintiff; several forms relating to the confiscation and disposal of Plaintiff's contraband; two documents concerning the designation of the Commitment and Treatment Program; Standing Orders of the Court relating to Adam Walsh Act matters; and psychological records relating to mass shakedowns of Plaintiff's cell, as well as other disciplinary matters concerning Plaintiff." Resp. Opp'n Mot. Compel [D.E. 33] 2.

Rule 26(b)(1) provides:

Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1). "[D]iscovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials." Herbert v. Lando, 441 U.S. 153, 177 (1979); see Hickman v. Taylor, 329 U.S. 495, 507 (1947). However, parties must comply with a court's local rules concerning discovery. Moreover, a litigant may not use discovery requests to annoy, embarrass, oppress, or cause an undue burden or expense to his opposing party. See Fed. R. Civ. P. 26(c)(1). Additionally, the court has "substantial discretion" to grant or deny motions to compel discovery. Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 929 (4th Cir. 1995); see Erdmann v. Preferred Research, Inc., 852 F.2d 788, 792 (4th Cir. 1988); LaRouche v. Nat'l Broad. Co., 780 F.2d 1134, 1139 (4th Cir. 1986).

5

The court denies the motion as untimely. Alternatively, English's remaining discovery requests are overly broad and not calculated to lead to the discovery of admissible evidence relating to his remaining claims. Thus, the court denies English's motion to compel.

II.

Next, the court addresses defendants' motion for summary judgment. Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249–50. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

English is civilly committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4248(d). See United States v. English, No. 5:07-HC-2187-D, [D.E. 126] (E.D.N.C. May 9, 2012), aff'd, 520 F. App'x 208, 209 (4th Cir. 2013) (per curiam) (unpublished). He is confined at Butner as a result of his commitment. English has three remaining claims: violations of due process in connection with several disciplinary actions against him, inspection of his outgoing mail, and monitoring of his telephone calls. Am. Compl. [D.E. 11] 6–10.

In 2006, the BOP established the CTP at FCI-Butner,

> which houses post-sentence inmates[2] who have been certified or committed as sexually dangerous persons under the Adam Walsh Act for the purposes of confinement and treatment. The overall mission of the CTP is to protect the public by reducing the incidence of sexual violence and child molestation in society by confining and providing comprehensive treatment services to individuals civilly committed as sexually dangerous persons. The purpose of providing such confinement and treatment is to assist these individuals in developing effective self-management skills, and to prepare them for productive and crime-free lives upon conditional discharge and release to the community.

Andrews Decl. [D.E. 37] ¶ 6. "CTP inmates are subject to BOP Program Statement 5270.09, Inmate Discipline Program, which helps to ensure the safety, security, and orderly operation of correctional facilities, and the protection of the public, by allowing BOP staff to impose sanctions on inmates who commit prohibited acts." Id. ¶ 7 (emphasis in original).

English completed serving his criminal sentence on July 25, 2008, and "has been subject to BOP disciplinary proceedings on eight [subsequent] occasions in accordance with BOP Program Statement 5270.09." Id. ¶ 10 & Atts. 1–2 [D.E. 37-1, -2] (BOP sentence computation and inmate disciplinary record); see Am. Compl. 6–9 (alleging English's claims "began on July 26, 2008" and describing various disciplinary proceedings). English has appeared before a Disciplinary Hearing Officer ("DHO") on three occasions for fighting with another person, threatening bodily harm, and mail abuse by writing a letter to one inmate on behalf of another inmate. Andrews Decl. ¶¶ 11–12, 18 & Att. 2. On each occasion, the DHO found that English committed the act as charged, and sanctioned him to various disciplinary measures, including disciplinary segregation (ranging from one to thirty days), and loss of email privileges, commissary privileges, and telephone privileges.

---

[2] The BOP "defines 'inmate' more broadly than the term 'prisoner'. . . [, which] comports with its plain meaning." Cooke v. U.S. Bureau of Prisons, 926 F. Supp. 2d 720, 729 n.4 (E.D.N.C. 2013) (citation omitted).

7

Id. Additionally, English has appeared before the Unit Disciplinary Committee ("UDC") on five occasions, charged with offenses including exchanging money for contraband, abusing the telephone, being in an unauthorized area, and possessing unauthorized items (pictures, magazines, or other contraband containing sexual content). Id. ¶¶ 13–17 & Att. 2. On each occasion, the UDC found that English had committed the act as charged, and sanctioned him to various disciplinary measures, including loss of visiting, telephone, email, and commissary privileges, in time increments ranging from thirty to sixty days. Id.

As for English's claim concerning his mail, all "CTP inmates are subject to 28 C.F.R. § 540.14 and BOP Program Statement 5265.14, Correspondence, which instructs that outgoing mail from an administrative institution[3] may not be sealed by the inmate and may be read and inspected by staff." Andrews Decl. ¶ 20 (emphasis in original). CTP inmates are additionally subject to a BOP regulation and policy concerning their incoming mail, "which instructs that 'institution staff shall open and inspect all incoming general correspondence.'" Id. ¶ 25 (citing 28 C.F.R. § 540.14 and BOP Program Statement 5265.14). The BOP monitors CTP inmates' incoming and outgoing mail for several reasons, including the need to detect contraband, "reveal escape plots, plans to commit illegal acts, plans to violate institution rules, or other security concerns." Id. "[S]ome [CTP inmates] have used general correspondence both to contact former victims and attempt to locate or groom new victims." Id. ¶¶ 22–23. CTP inmates are permitted to avoid BOP inspection of their incoming mail by "request[ing] that the BOP return the correspondence to the Postal Service." Id. ¶ 26 (citing 28 C.F.R. § 540.12(b) and BOP Program Statement 5265.14). Although English does not question the need to "examine[ incoming mail] for contraband and the safety and security of the facility," he

---

[3] The CTP is an "administrative institution" as defined by BOP. Id. ¶ 21 (citing BOP Program Statement 5100.08).

8

asserts that inspections of his mail should be performed in his presence. Am. Compl. 10. English also objects to the requirement that his outgoing mail indicate "that it is being sent from a 'Federal Correctional Institution' in the return address." Id.

Finally, as for English's claim concerning monitoring of his telephone calls, "BOP monitors the telephone calls of CTP inmates, with the exception of properly placed calls to an attorney, in order to preserve the security and orderly management of both FCI Butner and the CTP, and to protect the public" from any inmate's improper use of the telephone to either contact a former victim or attempt to locate or groom a new victim. Andrews Decl. ¶ 28.

The Fifth Amendment generally prohibits the federal government from subjecting civilly committed persons to punitive confinement conditions. See Youngberg v. Romeo, 457 U.S. 307, 321–22 (1982); Bell v. Wolfish, 441 U.S. 520, 535–37 (1979); Jones v. Blanas, 393 F.3d 918, 931–32 (9th Cir. 2004). To establish a conditions-of-confinement claim pursuant to the Fifth Amendment, a civil detainee must show either (1) an expressed intent to punish; or (2) a lack of a reasonable relationship to a legitimate non-punitive governmental objective, from which a punitive intent may be inferred. See Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). When determining whether a civil detainee's confinement conditions violate the Fifth Amendment, courts must balance the detainee's constitutionally protected liberties with the government's reasons for restricting those liberties. See Youngberg, 457 U.S. at 320–22. "[D]ue process requires that the conditions and duration of confinement [for a civilly committed person] bear some reasonable relation to the purpose for which [the person is civilly] committed." Seling v. Young, 531 U.S. 250, 265 (2001). Nevertheless, government officials are permitted to determine the conditions of a detainee's confinement, within the bounds of professional discretion. See Youngberg, 457 U.S. at 321–22. The Constitution is not concerned with de minimis restrictions on a detainee's liberties. Id. at 320; see

9

Jones, 393 F.3d at 932.

The court first addresses English's challenge to the disciplinary proceedings against him. Placement of a civil detainee "in a prison, subject to the institution's usual rules of conduct," does not per se signify punishment. See, e.g., Allison v. Snyder, 332 F.3d 1076, 1079 (7th Cir. 2003). "Disciplinary measures that do not substantially worsen the conditions of confinement of a lawfully confined person are not actionable under the due process clause, and this regardless of whether the confinement is criminal or civil." Miller v. Dobier, 634 F.3d 412, 414–15 (7th Cir. 2011) (citation omitted). "Put another way, unless the deprivation of liberty is in some way extreme, then the Constitution does not require that a prisoner be afforded *any process at all* prior to deprivations beyond that incident to normal prison life." Deavers v. Santiago, 243 F. App'x 719, 721 (3d Cir. 2007) (unpublished) (italics in original).

English has failed to demonstrate that he was subjected to sanctions which dramatically worsened the terms of his confinement. See Timms v. Johns, No. 5:10-CT-3210-BO, 2013 WL 6577379, at *5 (E.D.N.C. Dec. 13, 2013) (unpublished); Francis v. Johns, 5:11-CT-3005-FL, 2013 WL 1309285, at *7 (E.D.N.C. Mar. 28, 2013) (unpublished); see, e.g., Strutton v. Meade, 668 F.3d 549, 558 (8th Cir.), cert. denied, 133 S. Ct. 124 (2012).[4] Moreover, defendants have demonstrated that they imposed sanctions on English based on "relevant [governmental] interests of maintaining order and discipline in the [CTP] without unduly violating Plaintiff's liberty interests." Greenfield

---

[4] Indeed, the parties have not explained to the court what the conditions of administrative segregation are, nor have they compared its conditions to the typical daily conditions of the CTP. English has instead preferred to engage in statutory interpretations in an attempt to find a "loophole" making his entire confinement in a BOP-operated facility unlawful. See Pl.'s Resp. Opp'n Mot. Summ. J. [D.E. 41] 2–3. The court rejects English's argument. See Phelps v. O'Toole, Civil Action No. 10-10071-WGY, 2010 WL 1379810, at *2 & n.1 (D. Mass. Apr. 1, 2010) (unpublished); Ruston v. Gonzales, No. 07-40135-NG, 2008 WL 341632, at *2 (D. Mass. Jan. 29, 2008) (unpublished).

v. Corzine, No. 09-CV-4983 (DMC-JAD), 2012 WL 1134917, at *15 (D.N.J. Apr. 4, 2012) (unpublished); see Youngberg, 457 U.S. at 320–22 (recognizing the difficulty of maintaining order and discipline among those who have been civilly detained). Thus, the court grants summary judgment to defendants on this claim.

As for English's challenge to the monitoring and inspection of his mail, the court analyzes the claim under the four factors set forth in Turner v. Safley, 482 U.S. 78, 89–90 (1987), to determine whether the policy is reasonably related to a legitimate penological interest. See Rivera v. Rogers, 224 F. App'x 148, 151 (3d Cir. 2007) (unpublished) (approving application of Turner factors to civilly committed inmate's challenge to mail inspection policy); Cooke, 926 F. Supp. 2d at 736; Semler v. Ludeman, Civil No. 09-0732 ADM/SRN, 2010 WL 145275, at *11 (D. Minn. Jan. 8, 2010) (unpublished).

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

Beard v. Banks, 548 U.S. 521, 529 (2006) (alteration in original) (citations and quotations omitted); see Morrison v. Garraghty, 239 F.3d 648, 655 (4th Cir. 2001).

In applying these factors to the evidence before the court, "[t]he court finds that the BOP's policy regarding outgoing mail is reasonably related to legitimate penological interests." Timms, 2013 WL 6577379, at *5. Courts have repeatedly upheld institutional rules concerning restrictions on mail and electronic access for civil detainees. See, e.g., Ahlers v. Rabinowitz, 684 F.3d 53, 65 (2d Cir.), cert. denied, 133 S. Ct. 466 (2012); Rivera, 224 F. App'x at 151; Graham v. Main, Civil Action No. 10–5027(SRC), 2011 WL 2412998, at *13–14 (D.N.J. June 9, 2011) (unpublished);

11

Semler, 2010 WL 145275, at *9–11. That English would prefer a different policy concerning the monitoring of his mail does not render the challenged policy constitutionally infirm. English's complaint concerning his return address also fails. See Stile v. Cumberland Cnty. Jail, No. 2:12-CV-00260-JAW, 2013 WL 1881300, at *6 (D. Me. Mar. 26, 2013) (unpublished), report and recommendation adopted, 2013 WL 1881743 (D. Me. May 6, 2013) (unpublished); Rogers v. Isom, 709 F. Supp. 115, 116 (E.D. Va. 1989). Thus, the court grants summary judgment to defendants on this claim.

Finally, as for English's claim concerning the monitoring of his telephone calls, the court applies the Turner factors, and concludes that the BOP policy of "monitoring [non-legal] telephone calls . . . is reasonably related to . . . security interests in detecting and preventing crimes and maintaining a safe environment." Beaulieu v. Ludeman, 690 F.3d 1017, 1039–40 (8th Cir. 2012) (first alteration in original); see LaBlanc v. San Bernardino Cnty. Bd. of Supervisors, No. CV 07-04361-TJH (VBK), 2010 WL 5559683, at *17–18 (C.D. Cal. Sept. 29, 2010) (unpublished), report and recommendation adopted, 2011 WL 66105 (C.D. Cal. Jan. 5, 2011) (unpublished); Halbert v. Herbert, No. C 03-0237 JF (PR), 2008 WL 4460213, at *5 (N.D. Cal. Sept. 30, 2008) (unpublished). Thus, the court grants summary judgment to defendants on this claim.

III.

In sum, the court DENIES plaintiff's motion to compel [D.E. 32], and GRANTS defendants' motion for summary judgment [D.E. 35]. The clerk shall close the case.

SO ORDERED. This 11 day of February 2014.

JAMES C. DEVER III
Chief United States District Judge